*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

*In re* A. MIELKE, Minor.

UNPUBLISHED
April 13, 2023

No. 363339
Berrien Circuit Court
Family Division
LC No. 2019-000054-NA

Before: SHAPIRO, P.J., and REDFORD and YATES, JJ.

PER CURIAM.

Respondent-mother appeals as of right the trial court's order terminating her parental rights to her minor child, AM. On appeal, respondent asserts that the trial court erred when it ruled that termination was appropriate under MCL 712A.19b(3)(c)(*i*) and MCL 712A.19b(3)(j) and when it decided that the Department of Health and Human Services (DHHS) had made reasonable efforts to reunite respondent and AM. We affirm.

## I. FACTUAL BACKGROUND

Two days after AM was born, the DHHS petitioned the trial court to take custody of AM.[1] According to the petition, respondent lacked the supplies necessary to care for her newborn child, did not have the ability to transport AM for medical care, was unemployed, and had no financial means to care for AM. Furthermore, the petition alleged that respondent's home was inadequate because it had neither electricity nor running water. The petition also alleged that respondent had failed to seek or obtain any prenatal care for AM.

At the preliminary hearing in June 2019, the trial court authorized the petition, placed AM in foster care, and ordered that frequent parenting time occur, either supervised or unsupervised, at the discretion of the DHHS. The trial court specifically found that respondent and AM's father had no source of income,[2] did not have electricity or running water in their home, had no means

---

[1] A companion case, which is not part of this appeal, was already open regarding respondent's other children, CM and SM.

[2] AM's father was also a named respondent in this case. The trial court terminated his parental rights following a termination hearing. He is not a party to this appeal.

of transportation, and lacked the supplies required to care for their newborn child. A caseworker informed the trial court that respondent's two older children had been removed and placed with respondent's parents. But respondent's parents were unable to take an infant in their home at that time, even if respondent lived there as well, because they did not believe they could manage that responsibility and did not think that respondent could care for AM on her own.

A week later, respondent pleaded no contest to the allegations in the petition and the trial court assumed jurisdiction over AM. Following the no-contest plea, the trial court made findings on the record. The trial court found that respondent's residence had an overwhelming smell of gas fumes, no electricity or running water, and very little food. It also found that AM had received no prenatal care, and that respondent had few, if any, supplies available to care for a newborn.

By July 2019, respondent had moved into her parents' home, which caseworkers deemed appropriate housing. By October 2019, respondent had started working at a factory. Respondent worked five days per week and put in between 13 to 14½ hours per day. Because of respondent's demanding work schedule and the difficulty in getting time off, respondent struggled to attend parenting time on a consistent basis.

At a dispositional-review hearing in December 2019, respondent's attorney reported that respondent's parents were willing to have AM live in their home if respondent lived there as well. The trial court noted that respondent had raised a valid issue about returning AM to her care, but adjourned the hearing because the courtroom needed to be given to another judge.

At the continued hearing in February 2020, a foster-care worker confirmed that respondent had appropriate housing. But the caseworker testified that there was a lack of bonding between respondent and AM and that respondent seemed overwhelmed trying to care for all three children during the one visit that occurred between October 2019 and February 2020. The caseworker said that she would be in favor of returning AM to respondent's care if respondent first obtained a more regular schedule, attended parenting times, and worked on her bond with AM. The caseworker noted that respondent's work schedule had hindered her parenting time. The trial court described this situation as a Catch-22—employment was a barrier to reunification, but now that respondent had a job, she was unable to regularly attend parenting times and, as a result, lacked a bond with AM. Regardless, the trial court decided that more parenting time was necessary before AM could be returned to respondent's custody because of the lack of a bond.

At the next review hearing in July 2020, a caseworker explained that respondent had not participated in a single parenting-time visit since the last hearing and had had no contact at all with the caseworker. The lack of parenting time and the failure to participate in services were the results of respondent's employment and the COVID-19 pandemic. The trial court again determined that AM should remain in foster care because of the lack of a bond with respondent.

By the next hearing in September 2020, respondent had taken part in more visits with AM, but the caseworker described the visits as "difficult" for AM because she was afraid of respondent and struggled when having contact with respondent. The caseworker testified that respondent was interested in instructions on how to better bond with AM, but respondent could not consistently implement the instructions she received. The caseworker stated that AM was distraught for days after visits with respondent and AM's father. Because of AM's reaction to parenting-time visits,

the caseworker recommended the suspension of all parenting time. Additionally, respondent's job continued to interfere with her ability to participate in services. The trial court chose to order that parenting time continue via Zoom.

By the next hearing in October 2020, in-person parenting time had been reinstated and respondent had participated in one in-person visit with AM. The caseworker described that visit as "a little bit difficult" and said the bond was still lacking because of the length of time respondent and AM did not have visits, which was the main issue. The caseworker also stated that respondent gets overwhelmed by AM's emotions. Respondent participated in a Zoom visit, which went much better. At that time, caseworkers believed that AM might have a mental disability that required additional evaluation. AM was later diagnosed with a sensory processing disorder, as well as some emotional-regulation delays. Because of that impairment, AM required a structured routine, very predictable caregivers, and other specific management. It was possible AM would be diagnosed with autism, but a formal diagnosis could not be rendered until AM was at least three years old. AM was diagnosed with an unspecified genetic disorder and had dietary allergies and restrictions, environmental allergies, asthma, eczema, speech delays, and sensory processing delays. All those issues presented "everyday, ongoing concerns" for AM.

At the next hearing in January 2021, a caseworker testified that AM had continued to react negatively to visits with respondent. Petitioner asked for the suspension of parenting time, and the caseworker agreed with that request. The caseworker told the court that her feedback to respondent during parenting times was not implemented and that respondent was unable to comfort AM. The caseworker also stated that it was possible that respondent had a cognitive impairment. At the end of the hearing, the trial court directed petitioner to file a petition to terminate respondent's parental rights, but the goal remained reunification. The trial court also ordered that respondent's parenting time be suspended.

At the next hearing in April 2021, the caseworker testified that respondent had participated in counseling, but that respondent had made minimal progress and that nothing had changed. The caseworker confirmed that respondent did have a cognitive impairment, so respondent needed to have things explained very simply and concretely, with lots of opportunities to ask questions. After receiving confirmation of this impairment, the caseworker contacted respondent's therapist to be certain the therapist was accommodating the impairment. The caseworker also offered respondent a chance to have biweekly meetings to discuss AM's needs. AM's behavior had improved since parenting time was suspended.

At the next hearing in May 2021, the caseworker testified that a bonding assessment for respondent and AM had begun, but it was paused because respondent would benefit from trauma therapy before completing the assessment. Consequently, the caseworker referred respondent to a counseling service for trauma-focused behavioral therapy. The trauma therapy was planned as an accommodation for respondent because it was a service that was not typically implemented in child-protective cases. The caseworker said that she was not aware of any other services that could be provided for respondent, and she believed that all services that could be provided to respondent were being provided. The caseworker worked with respondent's therapist, AM's therapist, and the doctor who diagnosed respondent with a cognitive impairment to determine the best services to offer respondent.

At both the July and September 2021 hearings, there was evidence that respondent was participating in services, but not benefiting from them. The caseworker testified that respondent was participating in trauma therapy and was complying with all of petitioner's requests regarding services. The caseworker believed respondent was trying her best, but her cognitive impairment limited her ability to benefit from the services provided.

When the trial court held a permanency planning hearing in February 2022, parenting-time visits between respondent and AM had resumed, but AM regressed and remained in "a very, very dysregulated state, and not doing well at all." During and after the visits, AM's behavior included a lot of head banging, pulling out clumps of her own hair, biting herself, not sleeping, and having night terrors. AM would not let anyone but her foster mother care for her, including other members of the foster household. AM also regressed in several other developmental areas, including toilet training and language skills.

Eventually, the matter proceeded to a termination hearing, where the caseworker testified that respondent completed most of what was asked of her throughout the case but did not take full advantage of the services provided, mainly the counseling. The caseworker's overall impression was that respondent was just "going through the motions" and that respondent did not see a point in completing the services "because she wasn't going to reunify with [AM]." One service provider stated that respondent lacked the ability and interest to incorporate the assistance she was receiving in therapy. According to the caseworker, unsupervised parenting time was something that he could not imagine happening at that point. The caseworker observed that respondent's service providers went above and beyond what was required of them in providing services for respondent.

The social worker who performed the bonding assessment also testified, stating that she believed that the gaps in time between parenting visits improved the possibility of respondent and AM beginning to form a bond. The assessor agreed that the delay was not typical, but she believed that it had advantages, such as allowing respondent more time to work on her goals in counseling and allowing AM to mature and return to a better state of mind. The social worker testified about respondent's inability to implement the feedback she received during parenting time and inability to care for AM's special needs. She believed that AM would be harmed if returned to respondent's care because AM would remain dysregulated, which would negatively affect nearly every aspect of her life.

Respondent testified at the hearing that if she were not shy, she would have had no problem showing that she could meet AM's mental-health needs. She added that she just needed providers who would work with her on her shyness so that she could show progress. She explained that she was willing to do whatever she was asked to do to learn the parenting skills needed to care for AM. Respondent also testified that she was aware that AM had special needs that required specialized care, and she felt that she was able to provide for those needs in addition to AM's material needs.

At the end of the termination hearing, petitioner argued that termination was proper in this difficult case where "[e]very effort [had] been made" during the case and respondent participated in services, but did not make progress. Respondent countered that termination was inappropriate because she had participated in the recommended services and rectified her housing, financial, and transportation barriers. She also asserted that AM's mental-health conditions were not present at

the time of removal, but developed since then, and respondent never had the chance to bond with AM because of the gaps between the parenting-time visits.

The referee found that respondent was provided "very extensive and specialized services," including psychological services, specialized-parenting skills, services at the Children's Trauma Assessment Center, a bonding assessment, and reunification and counselling services. The referee determined that those services had gone "far beyond" services in a typical case and had attempted to address respondent's shyness, lack of a bond with AM, negative parenting-time experiences, and past trauma. Also, the DHHS had made special efforts to accommodate respondent's cognitive impairment, including slowly explaining services and expectations, having respondent repeat those requests, and staying in regular contact with respondent to ensure that respondent understood what was expected of her, how to meet those expectations, and to determine whether respondent needed further assistance. The referee found that petitioner "carefully provided these specialized services to the mother in an effort to help her succeed in reunification." Although respondent participated in all the services, the referee found that she did not complete all of them and still lacked the skills needed to properly care for AM and meet her extraordinary needs.

The referee found that, early in the case, respondent placed her work ahead of reunification services or had difficulty advocating for time off to attend those services. Respondent's decisions resulted in missed parenting-time visits during AM's infancy and a delay in reunification. Further, the referee found that respondent failed to complete her specialized counseling service and allowed the caseworker to believe that respondent continued to attend when, in fact, she had stopped going. Regardless, respondent made no progress in counseling and still did not understand AM's medical, psychological, or emotional needs or how to address those needs. The referee determined that respondent remained disconnected from the emotional needs of herself and AM, and she might not ever be able to establish a bond with AM. The referee noted that respondent attributed her lack of progress to her shyness, but respondent did not utilize the specialized counseling services to try to overcome that or other issues related to past trauma. The referee further found that respondent had failed to build a bond with AM.

The referee found that respondent was employed and had housing, but "all of the barriers [to reunification] continue to exist." The referee determined, by clear and convincing evidence, that termination of respondent's parental rights was warranted under MCL 712A.19b(3)(c)(*i*) and MCL 712A.19b(3)(j), and that termination was in AM's best interests. Thus, the referee ordered that respondent's parental rights to AM be terminated. Respondent now appeals.

## II. LEGAL ANALYSIS

On appeal, respondent asserts that the trial court erred when it found that termination was warranted under MCL 712A.19b(3)(c)(*i*) and MCL 712A.19b(3)(j). In addition, respondent faults the trial court for concluding that the DHHS made reasonable efforts to reunify respondent and her minor child. We will address these two arguments in turn.

### 1. STATUTORY GROUNDS FOR TERMINATION

We review "for clear error the trial court's factual findings and ultimate determinations on the statutory grounds for termination." *In re White*, 303 Mich App 701, 709; 846 NW2d 61 (2014);

MCR 3.977(K). A finding is clearly erroneous if this Court is "definitely and firmly convinced" that the trial court made a mistake. *In re White*, 303 Mich App at 709. We review the interpretation and application of statutes and court rules de novo. *In re Sanders*, 495 Mich 394, 404; 852 NW2d 524 (2014). "To terminate parental rights, a trial court must find by clear and convincing evidence that at least one statutory ground under MCL 712A.19b(3) has been established." *In re Moss*, 301 Mich App 76, 80; 836 NW2d 182 (2013). But "[o]nly one statutory ground for termination need be established" to support the trial court's decision. *In re Olive/Metts*, 297 Mich App 35, 41; 823 NW2d 144 (2012).

## A. MCL 712A.19b(3)(j)

Respondent insists that the trial court erred when it found that termination was proper under MCL 712A.19b(3)(j), which supports termination when "[t]here is a reasonable likelihood, based on the conduct or capacity of the child's parent, that the child will be harmed if he or she is returned to the home of the parent." The "reasonable likelihood of harm to children" contemplated by MCL 712A.19b(3)(j) includes emotional and physical harm. *In re Pederson*, 331 Mich App 445, 473; 951 NW2d 704 (2020). Further, "a parent's failure to comply with the terms and conditions of his or her service plan is evidence that the child will be harmed if returned to the parent's home." *In re White*, 303 Mich App at 711. Failure to benefit from services, such as the failure to recall what was learned in parenting classes, may also be considered as evidence that the child may be harmed if returned to the parent's care. *In re Sanborn*, 337 Mich App 252, 279-280; 976 NW2d 44 (2021).

The purpose of the juvenile code "is to protect children from an unfit home, not to punish bad parents." *In re Jacobs*, 433 Mich 24, 41; 444 NW2d 789 (1989). Children should not be left "to suffer long term damage merely because the neglect by the parents was not culpable." *In re Campbell*, 170 Mich App 243, 255; 428 NW2d 347 (1988). Accordingly, culpable neglect is not required for termination to be appropriate. *Id*.

Here, the trial court decided that termination was appropriate under MCL 712A.19b(3)(j). The trial court found that, despite the protracted proceedings and the extensive services provided, respondent still lacked the ability to properly care for AM's special needs physically, mentally, and emotionally, and did not understand the daily care that AM needed. The trial court expressed concern that respondent did not understand that she lacked the skills necessary to provide proper care for AM. The trial court also found that respondent had failed to build a bond with AM, that she had prioritized her employment above her participation in services and parenting time, and that she had not benefited from services provided to her. The trial court also noted the emotional trauma that AM appeared to be experiencing during the parenting-time visits with respondent.

On appeal, respondent asserts that her bond with AM was negatively impacted by the lack of parenting time and the fact that AM was placed in foster care. Additionally, respondent argues that, to the extent that she has a cognitive impairment, it is not severe enough to result in harm to AM. Respondent contends that, with the help of her parents, she can provide proper care for AM. Respondent does acknowledge that her bond with AM throughout the case was weak and that AM experienced emotional harm that was caused by the weak bond between respondent and AM.

The lower-court record supports the trial court's finding that AM was reasonably likely to be harmed if returned to respondent's care based on respondent's conduct or capacity. The record

reflects that, although respondent worked to improve her mental stability and parenting ability, she was not successful in rectifying either of those issues and she failed to make any real improvements in those areas. Respondent's participation in services does not foreclose termination if respondent does not benefit from that participation. *In re Sanborn*, 337 Mich App at 279-280. Respondent admits that AM was experiencing emotional harm during parenting time while in her care. It defies logic for respondent to concede that point, but nonetheless contend that the trial court clearly erred in finding a reasonable likelihood of harm to AM if she were returned to respondent's care. Thus, the record supports the determinations that respondent was unable to address AM's extreme needs and that AM suffered harm during respondent's parenting time.

Respondent does not insist that she had a bond with AM, but instead focuses on the causes of that weak bond. Although respondent contends that the weak bond resulted from issues beyond her control, the reasons for the weak bond are immaterial to the analysis of the trial court's decision that termination was warranted under MCL 712A.19b(3)(j).[3] The trial court did not clearly err in finding, by clear and convincing evidence, that the statutory ground for termination was met under MCL 712A.19b(3)(j).

### B. MCL 712A.19b(3)(c)(*i*)

Respondent also contests termination under MCL 712A.19b(3)(c)(*i*) because she contends that she rectified all the conditions that led to removal by obtaining employment, suitable housing, and transportation. Respondent insists that it was improper for the trial court to consider her lack of a bond with AM, her cognitive impairments, or AM's special needs under this statutory ground. According to MCL 712A.19b(3)(c)(*i*), the trial court may terminate a parent's parental rights if:

> (c) The parent was a respondent in a proceeding brought under this chapter, 182 or more days have elapsed since the issuance of an initial dispositional order, and the court, by clear and convincing evidence, finds [that]:
>
> > (*i*) The conditions that led to the adjudication continue to exist and there is no reasonable likelihood that the conditions will be rectified within a reasonable time considering the child's age.

By its terms, MCL 712A.19b(3)(c)(*i*) applies "when the conditions that brought the children into foster care continue to exist despite time to make changes and the opportunity to take advantage of a variety of services[.]" *In re White*, 303 Mich App at 710 (quotation marks omitted). In order to overcome a barrier to reunification, "meaningful change in the conditions existing by the time of adjudication" must be shown. *In re Williams*, 286 Mich App 253, 272; 779 NW2d 286 (2009).

Here, mother was a respondent in this matter and more than 182 days had elapsed since the issuance of the initial dispositional order. See MCL 712A.19b(3)(c). Respondent claims the trial court erred when it determined that the conditions that led to adjudication had not been rectified.

---

[3] Respondent's argument on this issue would have been more appropriately raised in a challenge to the trial court's decision to keep AM in her foster-care placement or to suspend parenting time, but that is not the challenge respondent has presented to this Court.

This dispute turns upon identification of the "conditions that led to the adjudication." Adjudication took place in July 2019 when respondent pleaded no contest. At that hearing, the trial court listed the conditions that led to the adjudication as respondent's lack of employment, suitable housing, financial resources, and transportation. Additional conditions included the fact that respondent had not obtained prenatal care for AM and had few, if any, supplies available to take care of AM. By the time the termination trial took place, respondent had obtained employment, transportation, and appropriate housing. In addition, the fact that respondent did not obtain prenatal care for AM is not a barrier that could be overcome after AM's birth; it was an event that occurred in the past. Thus, it is unclear how respondent could overcome that barrier once AM was born. Consequently, the evidence established that respondent had rectified the conditions that led to adjudication.

During the termination hearing, the referee found that, beyond those conditions, there were other conditions that led to adjudication, such as relationships, parenting skills, emotional stability, and the specialized needs of AM. But there is no support in the record for the finding that those conditions led to adjudication. Thus, it was improper for the trial court to consider those conditions when deciding whether termination was proper under MCL 712A.19b(3)(c)(*i*). Those conditions could have supplied proper grounds for termination under MCL 712A.19b(3)(c)(*ii*), but that statute is separate from MCL 712A.19b(3)(c)(*i*) and the two statutes cannot be used interchangeably. As a result, the trial court clearly erred when it found that the conditions that led to adjudication had not been rectified and that termination of respondent's parental rights was justifiable under MCL 712A.19b(3)(c)(*i*). Nevertheless, because we affirmed the trial court's decision that termination was appropriate under MCL 712A.19b(3)(j), the fact that the trial court erred when it determined that termination was appropriate under MCL 712A.19b(3)(c)(*i*) does not require reversal. *In re Olive/Metts*, 297 Mich App at 41.

## 2. REASONABLE EFFORTS

Respondent contends that termination was unwarranted because the DHHS failed to make reasonable efforts to reunite respondent and AM. Specifically, respondent asserts that the infant mental-health specialist the DHHS provided during respondent's visits with AM made visits worse because respondent was shy and would "close down" when being observed. Respondent insists that the DHHS should have provided individual psychiatric therapy to address respondent's issues, so the DHHS failed to make reasonable efforts toward reunification because it did not provide such therapy. The trial court's determination whether reasonable efforts were made is reviewed for clear error. *In re Fried*, 266 Mich App 535, 542-543; 702 NW2d 192 (2005). A decision is clearly erroneous whenever this Court "has a definite and firm conviction that a mistake has been committed[.]" *In re BZ*, 264 Mich App 286, 296-297; 690 NW2d 505 (2004). "Generally, when a child is removed from the parents' custody, the petitioner is required to make reasonable efforts to rectify the conditions that caused the child's removal by adopting a service plan." *In re HRC*, 286 Mich App 444, 462; 781 NW2d 105 (2009). For a parent with a disability, the DHHS must make reasonable modifications to the services or programs provided to reasonably accommodate that disability. *In re Hicks/Brown*, 500 Mich 79, 86; 893 NW2d 637 (2017).

Here, the referee made extensive findings about the efforts made by the DHHS. Without challenging those findings, respondent argues on appeal that the DHHS failed to make reasonable efforts because it did not provide individual psychiatric therapy. Respondent claims that individual psychiatric therapy would have helped her with her tendency to "close down" when being observed

-8-

and instructed during parenting-time visits.  But respondent ignores the extensive efforts petitioner made to rectify that precise issue, which included weekly meetings with caseworkers, conducting a bonding assessment, and referrals for mental and emotional therapy opportunities.  Respondent was referred to multiple trauma-focused therapy services that were aimed at helping her open up.  In addition, when petitioner became aware of respondent's cognitive impairment, extensive efforts were made to accommodate that impairment and to ensure that the services were adjusted in a way that made them easier for respondent to understand.  Thus, petitioner's efforts in this case were, at the very least, reasonable, so the trial court did not clearly err in making that determination.

Affirmed.

/s/ Douglas B. Shapiro
/s/ James Robert Redford
/s/ Christopher P. Yates